NEWPORT TRIAL GROUP
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
James B. Hardin, Bar No. 205071
610 Newport Center Drive, Suite 700
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiffs and the Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIPE MORALES, DAN BOBBA, and CHRIS RHODES, individually, and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　　　vs.<br><br>MAGNA, INC.; STEVE MOIDEL; and DOES 1-250, Inclusive,<br><br>　　　　Defendants. | Case No.  CV10 1601 EDL<br><br>**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**<br><br>DATE:　　　　October 12, 2010<br>TIME:　　　　2:00 p.m.<br>CRTRM:　　　　E<br><br>[Filed Concurrently with Plaintiffs' Memorandum in Opposition and Declaration of Wynn Ferrell] |

I, Scott J. Ferrell, declare as follows:

1.     I am an attorney duly licensed to practice law in the State of California and before this Court and am the Principal of the law firm Newport Trial Group, counsel for Plaintiff ("Plaintiff") and the class in this action.  I have personal knowledge of the following matters and, if called to testify concerning them, could do so competently.

2.     My first contact with Defendants was November 9, 2009 when I sent correspondence to defendant Magna, Inc. notifying it of a false advertising claim on behalf of my client, Kevin Vaughn regarding its Magna-Rx+ product.  ***In an effort to avoid an unnecessary dispute, however, in the letter I informed Magna, Inc. that if it would agree to cease all false advertising of the Magna-Rx+ product and make an appropriate disclaimer I would not further pursue a claim.***  A true and correct copy of my November 9, 2009 letter to Magna, Inc. is attached hereto as **Exhibit A**.

3.     In response, rather than agree to my offer or at least engage in constructive discussions toward ceasing the false advertising of Magna-Rx+, Defendants vaguely indicated that the false advertising may be either "from its old advertisement for the product that has been discontinued" or "generated by a third-party reseller of Magna-Rx+."  Defendants, through their counsel Joseph Schenk, ***did not*** offer to find out the origin of these false claims, nor did they identify any of the purported "third-party resellers" who may be responsible for the false claims.  Defense counsel merely claimed, without any detail or substantiation, that "Magna-Rx, Inc. has safeguards in place that are designed to prevent third-party resellers from making false or misleading claims regarding its trademarked product."  A true and correct copy of Mr. Schenk's November 19, 2009 letter to me is attached as **Exhibit B**.  As set forth in more detail herein, Mr. Schenk's claims were absolutely false.

4.     Given defense counsel's opaque response, I ***reasonably determined*** that Plaintiff needed to move forward with a lawsuit to, among other things, use civil discovery procedures to obtain reliable information regarding the merits of the case and

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO STRIKE**

the issues raised by Mr. Schenk, including: (a) all of the product labels and advertisements issued by the defendants – whether current or "discontinued" as defense counsel intimated; (b) the identity and role of unnamed "third-party resellers" in promoting and selling Magna-Rx+; and (c) the corporate and contractual interrelationships between Defendants and the various unnamed "third-party resellers" and their respective roles in the promotion and sale of Magna-Rx+.  Some of my questions regarding these subjects were articulated in my November 19, 2010 letter to defense counsel, a true and correct copy of which is attached as **Exhibit C**.

5.    Accordingly, my firm opted to proceed with the class action we had filed against Magna, Inc. and others responsible for promoting and distributing its Magna-Rx+ product in California state court based on California law claims on behalf of Mr. Vaughn.  A true and correct copy of the Vaughn Complaint is attached as **Exhibit D**.

6.    It was also significant to me that defense counsel ***did not*** try to defend the veracity of any of the claims regarding the Magna-Rx+ product, but instead tried to blame unnamed third parties.  Moreover, in a subsequent letter from defense counsel (a December 3, 2009 letter from Mr. Schenk attached hereto as **Exhibit F**), he admitted that Magna, Inc. owned at least one of the key websites that had posted many of the false statements regarding the Magna-Rx+ product.  While defense counsel did an admirable job of trying to explain why his client's ownership of an offending website was somehow not its responsibility  – i.e., that it was previously owned by another company that sold the Magna-Rx+ product but it was then purchased by defendant Magna, Inc., etc – it was clear to me, based on my firm's own investigation and the inadequate responses and omissions of defense counsel, that we should pursue the litigation against Defendants regarding the Magna-Rx+ product.  Attached as **Exhibits E** and **G** are true and correct copies of my November 29, 2010 and December 10, 2010 emails to Mr. Schenk describing some of the issues I sought further information about.

7.    In December 2009, in an effort to move the Vaughn case along, I requested depositions of several defense witnesses and unilaterally offered to put Mr. Vaughn up

for deposition at their request.  A true and correct copy of my December 24, 2009 email to Mr. Schenk is attached as **Exhibit H**.  In that vein, the deposition of defendant Steve Moidel was taken on April 12, 2010 and the deposition of my client, Kevin Vaughn, was taken on April 20, 2010.

8.     In his deposition, defendant Steve Moidel, the CEO and person most qualified witness of defendant Magna, Inc., made various admissions indicating that he and his company have made many false and misleading claims regarding the alleged efficacy of the Magna-Rx+ product.  The following table compares the statements Defendants made on their proprietary website www.magnarx.com – then subsequently took down because of this lawsuit – with various admissions defendant Moidel made under oath in deposition:

| **Defendants' Claims** | **Moidel's Admissions** |
|---|---|
| "In just a few short weeks, you'll be amazed as you watch your penis grow into the biggest, thickest, hardest one she's ever had and the one she'll remember forever and ever!" | Moidel admitted MagnaRx ***does not*** cause permanent penile enlargement, and any claim that is does is false). (Moidel Depo., 12:22-13:16, Ex. I) |
| Magna-Rx+ is "what many medical experts have called the world's most powerful Penis Enhancement Formula." | Moidel admitted Defendants do not have, and have never sought, any scientific evidence regarding the efficacy of the Magna-Rx+ product). (Moidel Depo., 64:8-21, Ex. I) |
| "The Magna-Rx+ formula is so powerful, so effective, so complete, we 100% guarantee that you'll *NEVER* have to purchase any more than the 60-day | Mr. Moidel admitted has no purported effect of MagnaRx is permanent and that the "guarantee" that a user will never need to buy the product |

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

| | |
|---|---|
| supply included in this special offer. We could have easily made Magna-Rx+ much weaker in order to have you buy more…Instead, we focus on getting the best results as quickly as possible. That's the secret of our success!  With the Magna-Rx+ System, you can skyrocket in 60 days or less – with nothing else to buy ever again." (emphasis original) | ever again simply means that a user will not be obligated to make future purchases of MagnaRx. (Moidel Depo., 36: 13-17; 43:12-19; 45:15-25; 73:22-74:19, Ex. I) |
| Defendants statement "How Magna-Rx+ Makes You a Bigger, Better Man" is written adjacent to a diagram of a flaccid penis.   This causes the consumer to believe that Magna-Rx+ has penis enlarging effects, and that those effects are seen in the flaccid penis. | Mr. Moidel admitted MagnaRx has no purported effect on the flaccid penis.  (Moidel Depo., 15:1-4, 18:8-10, 41:9-16, Ex. I). |
| The advertisement asserts a "Dr. Aguilar" is "the genius behind Magna-Rx+ … a Board Certified Urologist who has treated over 70,000 patients with erectile problems…a member of both the College of Urology, and the director of 46 urologists.   He is also a past president of his State Society of urologists." | While any consumer would have reason to believe that Dr. Aguilar is a leading member of the medical community in the United States, in reality he is not licensed to practice medicine in the U.S.  He has a small storefront "alternative medicine" clinic in northern Mexico.  Furthermore, Magna President Steve Moidel has testified that he has never had any direct |

| | |
|---|---|
| | communication with Aguilar. (Moidel Depo., 61:12-15, Ex. I). |
| That "with millions sold over the past two and a half years, Magna-Rx+ is currently the world's #1 best-selling male supplement" and that "Magna-Rx+ is the world's #1 best-selling Penis Enhancement Formula." | Mr. Moidel testified that Magna has no way of knowing how much male supplement product other companies sell, and that this statement has no basis in overall volume sold.   Rather, in support of this statement Mr. Moidel testified that "it is certainly our best selling product." (Moidel Depo., 76:3-77:19, Ex. I). |

8.     On April 5, 2010, I wrote an email to defense counsel that addressed several issues, including the upcoming deposition of Mr. Vaughn and also the possibility of settlement.   Thus, rather than seeking to multiply or prolong this litigation, I again tried to discuss early resolution of this case.   In my email, *I stressed that my client and I "remain interested in resolving this case without the need for lengthy litigation."*   I also indicated that we would be amenable to resolution in which defendant Magna, Inc. agreed to make appropriate disclosures about the medical background of its alleged creator and chief sponsor (Dr. Aguilar) as well as a corporate policy requiring defendant Magna, Inc. to control the false efficacy claims of affiliate marketers – *who Magna, Inc. claimed were making most or all of the false statements regarding its product*.   I also told them that I would submit a claim for attorneys' fees – to the extent that I was entitled to receive any – "to the discretion of the Court or an agreed-upon arbitrator. . . ."   A true and correct copy of my April 5, 2010 email is attached as **Exhibit J**.   That way, Defendants could argue that my firm was not entitled to ANY fees, if that was what they believed, and we could still resolve the litigation.

9.     On or about April 7, 2010, I notified defense counsel that I had been retained by another client (Felipe Morales, the original plaintiff in this action) to pursue

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

an action against Magna, Inc.  It was my view, as an experienced class action litigator, that it was advisable to pursue a nationwide class action against Defendants under California law to seek to address their sales of the Magna-Rx+ product throughout the United States since the key decisions seemed to emanate from California.  ***In an effort to avoid filing a separate lawsuit in federal court***, I first asked defense counsel to stipulate to amend the Vaughn lawsuit to include the nationwide class action claims of Mr. Morales.  The fact that I made this offer to combine the two cases – and that defense counsel rejected it – is confirmed in my written correspondence of April 7, 2010 to Mr. Schenk.  In that letter, I stated in pertinent part:

> Third, I have been retained in a new matter involving Magna-Rx.  Given that neither the class claims nor the defendants will not [sic.] be identical in the second case, and given your opposition to amending the pending lawsuit, we will be filing a second lawsuit….”

A true and correct copy of my April 7, 2010 correspondence to defense counsel is attached as **Exhibit K**.  Defendants did not accept this offer.

10.     On April 14, 2010, my firm filed this lawsuit before this Court on behalf of Mr. Morales.  As set forth in the complaint, we alleged a ***nationwide class*** action based on, among other things, the federal RICO statute.  On or about May 12, 2010, Defendants filed a Motion to Dismiss or Transfer Venue of this action.  Therein, Defendants argued strenuously that this Court should apply the Colorado River Abstention Doctrine because, among things, this action was essentially “duplicative” of the Vaughn case and constituted improper “forum shopping.”  (Defendants’ Motion to Dismiss 8:22-27).

11.     In response to those contentions, which were demonstrably false given my April 7th offer to include Mr. Morales’ nationwide claims within the Vaughn case, I ***again offered to consolidate both actions either before this Court or the California state court hearing the Vaughn matter*** – and I gave Defendants the option of choosing

1
2
3

which court would hear the proposed single action.  Specifically, in my May 19, 2010 email to Mr. Schenk, which I sent after reviewing his motion for transfer venue, I stated as follows:

4
5
6
7
8
9
10
11
12
13

> It is my understanding that your position is that the Vaughn and Morales cases should be before the same Court.  We do not object to this position; in fact, I believe that we proposed amending the Vaughn Complaint to add additional class representatives and assert a nationwide class earlier this year, but our request was declined. . . .
>
> With the preceding items in mind, we propose as follows:
>
> 1.   We will file a consolidated complaint asserting all of the preceding claims in either the Vaughn Court or the Morales Court, whichever one you select; . . .

14
15

A true and correct copy of my May 19, 2010 correspondence is attached hereto as **Exhibit L.**

16
17
18
19
20
21
22
23
24
25

12.    In that same May 19, 2010 correspondence, I also offered to: (a) bring the motion for preliminary injunction I had planned to file "on a mutually-agreeable date"; (b) file a motion for class certification "by no later than August 30th, 2010," and (c) "jointly request a proposed trial date in early 2011."  ***In short, I offered to consolidate the cases before a single court of defense counsel's choosing, streamline the motion process (i.e. one motion for preliminary injunction), and move the case(s) along toward a quick resolution (i.e., early motion for class certification and early trial date).***  Basically, I was trying to do the opposite of what defense counsel now accuses me of – supposedly multiplying, prolonging, and increasing the expenses of this proceeding unnecessarily.

26
27
28

13.    Again, Defendants rejected my offer to coordinate both cases.  Attached as **Exhibit M** is a true and correct copy of Mr. Schenk's May 24, 2010 email to me in

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

which he rejected this offer and raised several standing arguments that were later rejected by this Court on June 22, 2010.  Even though I believed, as a general proposition based on its position in our federalist system, a Federal District Court would tend to be more comfortable certifying a nationwide class than a California State Court, in the interest of streamlining this proceeding, I repeatedly sought to consolidate these two cases – even if it meant allowing defense counsel to consolidate both cases in California State Court.  I did this in an effort to foster efficiency of the courts, the parties, and their counsel.  And the fact that defense counsel was refusing this offer indicated to me that they were trying to avoid defending against a putative nationwide class action via procedural machinations.

14.     Thus, before opposing Defendants' motion to dismiss/transfer venue, I sent defense counsel another email in which I again reminded them of my offer to consolidate both cases and offered several reasons why some of their arguments in the motion were unpersuasive.   A true and correct copy of my May 24, 2010 email is attached as **Exhibit N.**   In that email, I again urged them to reconsider my offer to consolidate the cases, stating in pertinent part:

> We respectfully request that you reconsider our offer to consolidate the two cases, as that offer will be withdrawn as of noon tomorrow (May 25th, 2010), when we begin working in earnest on the Oppositions to the referenced motions.

15.     Given that I offered in writing ***at least three times*** to consolidate the two actions before a single court of Defendants' choosing, I do not understand Defendants' argument that I "unreasonably and vexatiously multiplied the proceedings before this Court" with respect to the filing of the complaint or the hearing of Defendants' motions to dismiss/transfer venue.  To the contrary, both of these filings and the related briefing and hearings, would have been ***completely unnecessary*** if Defendants had not stridently refused my repeated offers to coordinate these cases.

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

16.    On June 22, 2010, the Court heard Defendants' motion to dismiss/transfer venue.  A true and correct copy of the reporter's transcript from this hearing is attached as **Exhibit O**.   I believe this transcript further ***demonstrates the good faith and reasonable nature of my firm's conduct,*** rather than the contrary as Defendants argue in this motion.   As an initial matter, the court rejected several of Defendants' substantive arguments in a manner that actually affirmed positions taken by Plaintiff.  First, this Court found that the Colorado River Abstention Doctrine should not apply and thereby rejected Defendants' argument in the motion – which they are still asserting in their motion for sanctions here – that this action was essentially "duplicative" of the Vaughn case and constituted improper "forum shopping." (Defendants' Motion to Dismiss 8:22-27).  Specifically, the Court stated as follows:

> **The Court**:   Well, the problem I have with the Colorado River Abstention Doctrine, as the pleadings stand right now, is that there is a RICO claim here and there isn't in the state court action.
>
> So I think the Colorado River Doctrine is applied very sparingly.  And it's not – since there is no RICO action in that case, it would seem that it can't resolve that part of this case.  And, therefore, it doesn't apply as things stand right now. . . .

(June 22, 2010 Transcript 5:9-17).

17.    Indeed, given that on June 22 this Court expressly found this case ***did not*** duplicate the Vaughn case, it is plainly unfounded for Defendants to ***re-argue the same invalid position as a supposed basis for sanctioning Plaintiff's counsel***.  Yet, that is exactly what Defendants have done here.  On page one, lines 26-27 of their Motion for Sanctions, Defendants argue that one of the primary basis for sanctions against Plaintiff's Counsel is that he "[f]iled this purported class action lawsuit on behalf of

- 9 -

former Plaintiff Felipe Morales ("Morales"), even though ***the claims are essentially the***

***same*** as those previously asserted by Plaintiffs' counsel in a class action lawsuit filed in

a California State Court and even though Morales, as a California resident, would have

been a member of the putative class alleged in the State Court litigation." (emphasis

added).

18.    In that same transcript, the Court directly rejected several other arguments

made by Defendants.   Regarding Defendants' lack of standing argument, the Court

stated: "I didn't find that very persuasive."  (June 22 Transcript 5:9-17).    The Court

also rejected Defendants' "prior settlement"-argument as premature.    (June 22

Transcript 10:11-21).    The only argument from Defendants that this Court found

persuasive was the objection that my declaration lacked foundation and personal

knowledge.    On this point, I believe the conduct of Plaintiffs' counsel (first-year

associate Michael Velarde) was completely appropriate.   Indeed, I believe the hearing

transcript attests to the candor and forthrightness demonstrated by Mr. Velarde at the

hearing.

19.    In response to the Court's initial view that my declaration lacked

foundation, Mr. Velarde correctly noted that my office had been contacted by two

additional consumers that we intended to add as plaintiffs to an amended pleading.

(June 22 Transcript 3:14-18).[1]

20.    This Court then found, as suggested by Mr. Velarde, that it would be ***much***

***more efficient*** for the Court to allow Plaintiff' leave to amend than completely dismiss

the case:

---

[1] Defendants falsely assert in their motion that Plaintiff's Counsel "[f]alsely represented
to the Court that they had ***been retained*** by two new clients who had purchased Magna-
Rx+ when, in fact, they were actually just soliciting individuals to agree to serve as
class representatives."   Motion for Sanctions 2:22-23 (para 8) (emphasis added).   In
truth, Plaintiff's counsel correctly informed the Court at the June 22 hearing that
Plaintiff's counsel "***had been contacted*** by two additional plaintiffs that we intend to
add as named plaintiffs in a First Amended Complaint."   (June 22 Transcript) (emphasis
added).   As set forth in the concurrently filed declaration of Wynn Ferrell, that was, and
is, an absolutely true statement.   It is Defendants who have tried to mischaracterize the
record.

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SANCTIONS**

1
2
3

    **Mr. Velarde**: . . . We believe that it would be more efficient to give us the opportunity to amend rather than dismiss or transferring . . . .

4
5
6
7
8

    **The Court**: Well, I mean, the problem from the court system, if I transfer it to the Central District and then you actually do file a new claim, here we have two different federal court suits and a state court suit.  That doesn't seem like [sic.] positive development.

9

    . . .

10
11
12
13
14

    **The Court**:  Right.  But my point is, then, that will be a related case to me and we'll just be back here in a few weeks anyway.  If they don't amend, if I give a two-week deadline, then there's no satisfactory amendment, then the case will be over.  So, I think that's probably the simpler thing to do.

15
16
17
18
19

    So I will – I'm going to, I guess, grant leave to amend, two weeks, to have a complaint that properly states a basis for venue here.  And that may include adding plaintiffs.  It can include deleting this plaintiff.  But if that isn't done in a satisfactory way, then I will dismiss the case.

20

(June 22 Transcript 11:5-12:14).

21
22
23

    21.    When this Court asked Plaintiffs' Counsel why he didn't obtain a declaration from Mr. Morales, Mr. Velarde candidly responded that we had lost contact with him:

24
25

    **The Court**:  . . . Why didn't you get a declaration from him that he purchased them in this District?

26

    **Mr. Velarde**:  He's out of the country at this time.

27

    **The Court**:  Until when?

28

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SANCTIONS**

1         **Mr. Velarde**:  I'm not sure.

2         **The Court**:  So you've lost track of your plaintiff?

3         **Mr. Velarde**:  He is very mobile.  I personally have not been

4         able to get in contact with him recently.  I can't speak for

5         when he is going to be back.  I know that he's traveling.  But

6         we were not able to get a declaration from him personally on

7         that issue.

8   (June 22 Transcript 9:2-12).   To further confirm that the Court understood this

9   information, the Court then aptly noted that Mr. Morales was "A.W.O.L."  (June 22

10  Transcript 10:23-24).

11      22.   Thus, rather than being somehow bamboozled by the supposed

12  misrepresentation by Plaintiff's Counsel, the transcript from the June 22 hearing

13  establishes that: (a) Plaintiffs' counsel candidly informed the Court that they had lost

14  contact with Mr. Velarde and he was essentially AWOL; and (2) this Court found,

15  based on its own clear and logical reasoning, that efficiency would be better served by

16  allowing Plaintiffs two weeks to try to amend the complaint by adding plaintiffs and/or

17  dropping Mr. Morales rather than dismissing the case as Defendants requested.

18      23.   Defendants' assertion that my June 1, 2010 declaration, is false or

19  misleading by indicating that I had "confirmed" Mr. Morales' February 2010 purchase

20  of the Magna-Rx+ product in San Francisco, is another incorrect and unfair position.

21  Before signing my declaration, I "confirmed" this information at my firm internally,

22  including by speaking with Wynn Ferrell, an investigator for my firm (who is also my

23  father).  I did not speak with Mr. Morales, nor imply that I had done so.

24      24.   Similarly, Defendants' assertion that we did not "timely disclose to

25  Defendants or the Court that [we] had lost contact with Morales" is misguided.  It was

26  not clear to me until around late June that Mr. Morales' unavailability may have

27  become permanent.  At the hearing, Plaintiffs' Counsel promptly disclosed everything

28  we knew regarding Mr. Morales' status, and in part based on the Court's observation

- 12 -

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SANCTIONS**

that he was "AWOL" – soon decided to proceed in this case *without Mr. Morales*.  I, of course, had no reason to conceal the fact that we had been out of touch with our client, which happens occasionally in consumer class action cases.

25.    Accordingly, on or about July 8, 2010, my office withdrew Plaintiffs' Motion for Preliminary Injunction by filing and serving a Notice of Withdrawal, a true and correct copy of which is attached as **Exhibit P**.  We did this only one day after we filed a Notice of Dismissal of Mr. Morales as a class representative, and well in advance (five days) of the July 13, 2010 deadline for Defendants to oppose the motion. In fact, Defendants never had to and never did file any opposition to Plaintiff's Motion for Preliminary Injunction.  Thus, it is difficult to discern a sound basis for Defendants' assertion that my withdrawal of this motion was somehow untimely.

26.    Defendants' most inflammatory assertion – that Plaintiffs' counsel improperly offered compensation to class representative Bobba, knowingly asserted false allegations in the First Amended Complaint, and then – when it became apparent they would be deposed – promptly dropped the lawsuit to avoid exposure of this supposed scheme – *is completely and totally false.*  My office has, in fact, confirmed that the internet posting Defendants attach to their motion did come from plaintiff Dan Bobba ("posts"), but the information contained therein is largely false.  First, Dan Bobba has submitted a sworn declaration in which he describes the posting as provocative locker room talk between himself and some friends.  (See ¶ 28 below). Second, as set forth in the declaration of Wynn Ferrell, *no one from my office ever did anything remotely similar to what the posting says*.

27.    The first my office ever heard of the posts was when we were served with Defendants' Motion for Sanctions.  I then immediately spoke with Wynn Ferrell, who confirmed that things claimed were never said by him or anyone else from Newport Trial Group.  Wynn Ferrell confirms this in his declaration.  I then briefly reviewed the posts and could tell immediately that much of the posts – if they were in fact purporting to refer to me or Newport Trial Group – were fanciful.  For instance, I have never met

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SANCTIONS**

or directly spoken with Mr. Bobba and no lawyer from my office had ever met with him at the time of his posting; yet, the posts state that "the lawyer comes over twice and has me sign some documents for this suit saying I took it, it doesn't work, and the company is false advertising."  Similarly, the indication that Mr. Bobba's "friend" called him up and said "his girlfriend's brother is a class action lawsuit attorney" makes no sense because, although I have two sisters, they are both married with multiple children, devoutly religious, and live out of state.  They know nothing of the details of my practice, know nothing about this case, and neither of them have "boyfriends" or know Mr. Bobba or any of his "friends."

28.    Perhaps more importantly, after learning of these alarming statements made in the posts, I asked Wynn Ferrell to try to contact Mr. Bobba and get to the bottom of this.  As set forth in Wynn Ferrell's declaration, on or about September 4-5, he met with Mr. Bobba and found out, as I had suspected, that the posts were fanciful and joking banter.  I believe the September 5, 2010 Declaration of Dan Bobba, attached as Exhibit A to Wynn Ferrell's declaration (and Exhibit Q to this Declaration for ease of reference) sets the record straight as to what we told Mr. Bobba, how we conducted ourselves, and the fanciful nature of the posts.  I think Mr. Bobba's declaration speaks for itself. Quite simply, it shows that neither I nor anyone from my office acted improperly.  As Mr. Bobba admits, the posts were just "a locker room rant designed to impress [Mr. Bobba's] buddies, make them laugh, just be funny."  Although based loosely on actual events, they are false in many important respects. Moreover, my office is prepared to submit – upon request by the Court – internal memoranda from within Newport Trial Group showing that my office confirmed the relevant facts regarding the product purchases by Messrs. Bobba and Rhodes before adding them as plaintiffs in this action.

29.    There is also **no truth** to Defendants' claim that we were unwilling to put up Messrs. Bobba and Rhodes for deposition, and ultimately dismissing this case, out of fear of having this supposed improper compensation ring exposed.  Defendants first

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**

1  requested these depositions on July 29, 2010, as indicated in the true and correct copy
2  of Mr. Schenk's July 29, 2010 letter to me attached as **Exhibit R**.  In my August 20,
3  2010 correspondence to Mr. Schenk, a true and correct copy of which is attached as
4  **Exhibit S**, I expressly confirmed that Mr. Bobba's deposition would proceed the
5  following week, but indicated (admittedly without a thorough explanation) that Rhodes
6  could not be deposed the following week.[2]  I have attached a few internal Newport Trial
7  Group memoranda which confirm that I was making plans to travel to and defend Mr.
8  Bobba's deposition.   For instance, in an August 22, 2010 email to my office manager
9  (Linda) and personal assistant (Beaudrea) attached as **Exhibit T** (redacted), I addressed
10 various personal items and then asked my assistant (Beaudrea) to "[d]etermine whether
11 it would be more efficient for you to drive me to the Bobba deposition in San Raphael
12 on Thursday or for me to fly there and back, inclusive of airports, taxis, etc."  In an
13 email on August 23, 2010 attached as **Exhibit U**, my assistant asked me:  "What time
14 do you want to fly out for the depo and fly back?"

15      30.    Soon thereafter, I learned of personal information regarding Mr. Bobba
16 which caused me to believe that it would be difficult to show he was an adequate class
17 representative.   Given that Mr. Rhodes remained unavailable and I had concerns
18 regarding Mr. Bobba's viability as a class representative, I made the decision to
19 promptly dismiss the action without prejudice.  I believed this course was preferable to,
20 for example, trying to maintain the case while trying to find other viable plaintiffs.

21      31.    I still believe that the merits of the case against Defendants are strong.
22 With an appropriate class representative, a nationwide class can and should proceed
23 against them.   However, for the various reasons I have outlined herein, I ultimately
24 chose to dismiss the case before this Court without prejudice all the while acting in a
25 good faith and reasonable manner under the circumstances.

26

27 _____

28 [2] As indicated in Wynn Ferrell's declaration, my firm had by then also lost contact with
   Mr. Rhodes despite our best efforts to communicate with him.

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SANCTIONS**

1
2
3

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on September 21, 2010 in Newport Beach, California.

4
5

_/s/  Scott J. Ferrell_____
Scott J. Ferrell

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF SCOTT J. FERRELL IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS**